AGNES McEWAN, *Widow, etc., v.* STATE COMPENSATION COMMISSIONER *et al.*

(No. 9182)

Submitted April 15, 1941.   Decided May 20, 1941.

*Ned H. Ragland* and *Ashworth & Sanders,* for appellant.
*J. W. Maxwell,* for appellees.

RILEY, JUDGE:

Agnes McEwan, surviving and dependent wife of Thomas McEwan, deceased, late employee of C. H. Mead Coal Company, appeals from an order of the Workmen's Compensation Appeal Board affirming a ruling of the Workmen's Compensation Commissioner refusing compensation on the ground that the death of claimant's husband did not result from an injury received as a result of and in the course of his employment.

On January 12, 1940, decedent, then employed by said coal company as a fire boss at its No. 3 mine at East Gulf in Raleigh County, while en route from work to his home, was killed almost instantly by a train of empty coal cars of the Virginian Railway Company.

The coal operations involved in this appeal are located in a deep narrow valley, between precipitous mountains, through which Stone Coal Creek runs in a westerly direction. The Virginian Railway Company's main line parallels the creek to the north. The opening to No. 3 mine is north of the railroad and almost directly opposite No. 2 mine, which is south of Stone Coal Creek. The conveyor from No. 3 mine crosses above the main line track to a tipple, which serves both mines. To the north of, and parallel with, the main line track, is a supply track, which branches off the main line several car lengths east of the conveyor, and extends westward beyond a county road crossing. Between these two tracks is a well-defined path starting at, or a short distance east of, the conveyor, and extending down to the intersection of the county road

with the railroad. A track, spoken of as the "slate" track, branches off the supply track to the north, just east of the conveyor, and runs parallel with the latter track for a short distance west of the conveyor. To the south of, and parallel with, the main line are six side tracks, which run under the tipple and are used in the loading of coal from the two mines. To the north of the railroad is a county road, and between the tracks and this road there is located, in the vicinity of the opening of No. 3 mine, a fan house, the office for No. 3 mine, a lamp house, and a building containing showers, shop and supplies. There is a road running from the lamp house in a northeasterly direction to the county road hereinbefore mentioned. Just east of these buildings are a number of mine tenement houses. The No. 2 mine entrance, its office and a powder house, are south of Stone Coal Creek.

About nine hundred men were employed in the coal company's mines at East Gulf in three eight-hour shifts. Most of them lived either near the mine entrances on the coal company's property, or some distance away from the mine property. About five per centum, including decedent, lived on the coal company's property south of the railroad tracks, and one-half mile to the west of the entrance to the No. 3 mine. Employees in both mines, Nos. 2 and 3, used in common the power house, lamp house and showers. So, the great majority of the men working in the two mines were wont, as a matter of daily routine, to cross the railroad tracks. All living south of the tracks who worked in No. 3 mine, including decedent, had to cross the supply and main tracks of the railroad in order to get to and from their work; all who lived north of the tracks and worked in No. 2 mine had to do likewise; all who lived south of the tracks and worked in No. 2 mine had to cross the tracks in order to get and deposit their lamps at the lamp house and go to the bath house, if they desired; and all who lived north of the tracks and were engaged in shooting coal had to cross to the south of the tracks to the powder house in order to get powder and other supplies. Decedent, who was a fire boss, was

not required to cross the tracks for any purpose other than to go to and from work.

After completing his work at approximately three o'clock in the afternoon, decedent deposited his lamp at the lamp house, and, accompanied by J. M. Jessup, No. 3 mine foreman, started home. Except when cars were being switched, a space on the supply track east of the conveyor was kept open, thus permitting free access from the vicinity of No. 3 mine across the supply track to the path. However, decedent and his companion finding the supply track blocked at the conveyor by a string of cars, then started in a westerly direction along the slate track. At a point variously testified as being sixty-seven to one hundred and thirty feet, the two undertook to go through the string of cars in order to reach the path. Jessup crossed over a coupling between two cars, and decedent proceeded to cross under the coupling. At the same time, the engine which was attached to the cars some distance east of the conveyor was started without warning, and decedent was caught by one of the brake rods of the car, dragged about one and one-half car lengths and fatally crushed. If decedent had been successful in his attempt to cross over to the path, and had reached the point where the county road crosses the railroad, he could have proceeded on the county road across the main line of the railroad and south thereof to his home.

Decedent, it appears, had two ways to go home other than the one which he pursued along the slate track on the day he was killed: one, if the supply track was not blocked at the conveyor, was to cross the tracks to the path between the supply and the mainline tracks, and then proceed along the path as heretofore indicated; and the other, to take the road from the lamp house to the county road, and thence in a westerly direction to, and over, the railroad. The distance to decedent's home by the latter route was about two hundred fifty feet farther than the way along the path between the tracks.

There is substantial evidence in the record to the effect that decedent, with a number of other employees, living in the vicinity of decedent's home, were accustomed to

proceed along the path between the main line and supply track, and to cross the tracks at the conveyor and at various distances west thereof in the direction of decedent's home. This was done with the acquiescence of both the coal company and the railroad company. The latter, however, protested the practice of men in going between the cars.

Decedent occupied the coal company's house under a contract which provided that the house was used in connection with the employer's business and incidental thereto, and that it was for the use of its employee as an incident to his employment and service, and for the better performance of the employment and service. In this regard, the contract provisions are substantially identical with those considered in the case of *Canoy* v. *State Compensation Commissioner,* 113 W. Va. 914, 170 S. E. 184.

Evidently decedent was negligent in crawling under the coupling between the cars. However, it is really needless to say that under the workmen's compensation law of this state, in the absence of willful violation of rules legally promulgated, negligence not amounting to willful misconduct will not bar recovery. *Long Flame Coal Co.* v. *State Compensation Commissioner,* 111 W. Va. 409, 413, 163 S. E. 16. Under some circumstances, the claimant here may have been barred because of decedent's conduct. Here, however, for a long period of time, the employer acquiesced in the conduct of its employees in crossing the supply track and between railroad cars standing thereon. In fact, there is evidence to the effect that where the main tracks are blocked by a full train of standing cars, many of the employees went between the cars in order to reach the path. Willful misconduct, in the face of the employer's acquiescence, does not preclude compensation. *Caldwell* v. *Workmen's Compensation Appeal Board,* 117 W. Va. 706, 188 S. E. 122.

Thus the controlling question presented by this record is whether decedent was killed within what is commonly called "the zone of his employment." Of course, that zone must be determined by the circumstances of each case. *Carper* v. *Workmen's Compensation Commissioner,* 121

W. Va. 1, 1 S. E. (2d) 165. In *Canoy* v. *State Compensation Commissioner,* 113 W. Va. 914, 170 S. E. 184, and *DeConstantin* v. *Public Service Commission,* 75 W. Va. 32, Pt. 2 Syl., 83 S. E. 88, L. R. A. 1916 A, 329, this Court has committed itself to the doctrine that the right to compensation is not barred by reason of the fact that the employee's injury or death occurred outside the premises of the employer where "the place of injury was brought within the scope of employment by an express or implied requirement in the contract of employment, of its use by the servant in going to and returning from his work."

On the question of whether decedent was injured within the zone of his employment, we think, after a careful review of the record, that this case fully meets the requirements established in both the *Canoy* and *DeConstantin* cases. In fact, it is strongly analogous with the *Canoy* case. Here the contract between the employer and decedent as to the occupancy of the house is substantially the same as in the *Canoy* case. In both cases decedent's house was located on the employer's property; in going from his work to his home at the time he was injured, decedent was using a way, not on the employer's property, which he and many of his fellow-employees were accustomed to use; and under the instant circumstances, he was using the most convenient, though perhaps a dangerous way. The only substantial difference between the two cases, which we think does not amount to a difference in principle, is that the decedent here was using the property of the railroad company in common with his fellow-employees, with the acquiescence of both the employer and the railroad company, while in the *Canoy* case the employee was using a public road which, in addition to its public use, was used in common by Canoy and his fellow workmen. The facts and principles in the *Canoy* case, considered with the record in this case, impel us to the opinion that decedent was killed within the zone of his employment and that, therefore, his death resulted from an injury occurring in the course of and resulting from his employment. For these reasons, we are of the opinion that the Appeal Board erred in affirming the

ruling of the Commissioner, holding that decedent's death was not caused by an injury in the course of and resulting from his employment.

The order of the Appeal Board and the ruling of the Compensation Commissioner are reversed and this case remanded with directions to award compensation to claimant as provided by statute.

*Reversed and remanded.*